UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BOSTON CONSULTING GROUP, INC.,<br>Plaintiff,<br>v.<br>MAX A. RADY,<br>Defendant. | Case No.: 1:26-cv-08298 |

**BOSTON CONSULTING GROUP, INC.'S**
**DECLARATORY JUDGMENT COMPLAINT AGAINST MAX A. RADY**

The Boston Consulting Group, Inc. ("BCG"), by and through its counsel, for its Complaint against Max A. Rady alleges as follows:

**NATURE OF THE CASE**

1. Dr. Rady, a resident of France and former BCG employee, began a campaign of patent infringement lawsuits against BCG in this Court more than six years ago. Judge Andrew Carter held that Dr. Rady's patent was invalid under 35 U.S.C. § 101 and dismissed the case, and the Federal Circuit affirmed that decision. Dr. Rady has since filed, dismissed, and refiled cases asserting infringement of ***continuations*** of his invalidated patent against BCG, its clients, and other entities all over the country to try to avoid another adverse result in this Court. BCG brings this declaratory judgment action to end Dr. Rady's brazen forum shopping and multiplication of these proceedings. The alleged validity and infringement of Dr. Rady's continuation patents should be litigated in this District, where Dr. Rady first filed his patent infringement claims and where the business transactions that allegedly underlie those claims took place.

2. On March 13, 2020, Dr. Rady filed a patent infringement action against BCG and De Beers in this Court: *Rady v. Boston Consulting Group, Inc. et al.*, Case No. 1:20-cv-02285 (S.D.N.Y.) (Carter, J.) ("New York Action").

3. Dr. Rady alleged that while he was employed at BCG and working in BCG's New York office, he disclosed his "invention" relating to identifying and tracing diamonds and other physical objects to co-workers at BCG. New York Action, D.I. 30 ¶¶ 33-40. Dr. Rady further alleged that while he continued to work from BCG's New York office, he provided a copy of his unpublished patent application to others at BCG. *Id.* ¶ 38. Dr. Rady alleged that BCG then misappropriated his purported invention in connection with its work on a project for its client De Beers—which led to De Beers' Tracr platform, a diamond-tracking platform launched in New York City in 2019. *Id.* ¶¶ 11-14, 67. Dr. Rady contended that BCG and De Beers infringed his U.S. Patent No. 10,469,250 ("'250 Patent"). *Id.* ¶¶ 85-93. Dr. Rady also asserted claims for trade secret misappropriation and breach of contract. *Id.* ¶¶ 94-117.

4. BCG and De Beers moved to dismiss Dr. Rady's patent infringement claim on the ground that the claims of the '250 Patent were invalid under 35 U.S.C. § 101. New York Action, D.I. 37, 38. Judge Carter held that all claims of the '250 Patent were invalid under Section 101 and dismissed Dr. Rady's patent infringement claim. *Id.*, D.I. 58. Dr. Rady then dismissed with prejudice his misappropriation and breach of contract claims (*id.*, D.I. 82) and appealed the dismissal of his patent infringement claim (*id.*, D.I. 85). The Federal Circuit affirmed the district court's decision invalidating the '250 Patent claims under Section 101. *Rady v. Boston Consulting Group, Inc.*, No. 2022-2218, 2024 WL 1298742 (Fed. Cir. Mar. 27, 2024).

5. More than one year later, Dr. Rady re-filed his grievances against BCG and De Beers in the Southern District of Texas: *Rady v. Boston Consulting Group, Inc. et al.*, Case No.

4:25-cv-04031 (S.D. Tex.) (Rosenthal, J.) ("Texas Action"). In the Texas Action, Dr. Rady asserted patent infringement claims against, *inter alia*, BCG, De Beers, De Beers' parent Anglo American, Signet Jewelers (a diamond jewelry retailer), and Brilliant Earth (a retailer of ethically sourced jewelry). Texas Action, D.I. 1. Dr. Rady alleged that BCG infringed continuations of the invalidated '250 Patent, including U.S. Patent Nos. 12,375,261 ("'261 Patent") and 12,401,496 ("'496 Patent"). Texas Action, D.I. 25, ¶¶ 148-186. Dr. Rady again alleged that BCG and De Beers infringed in connection with the development and release of the Tracr platform, and other accused products. In the Joint Discovery/Case Management Plan filed in the Texas Action, BCG, De Beers, Anglo American, Signet, and Brilliant Earth each indicated its intention to seek dismissal of Dr. Rady's claims or transfer to the Southern District of New York. Texas Action, D.I. 86 at 6-8.

6. At the initial conference in the Texas Action, BCG, De Beers, and other defendants confirmed that venue would be proper in the Southern District of New York. The court explored that issue at length, and it became clear that the court was likely to transfer Dr. Rady's claims back to New York. Rather than risk having his claims transferred back to New York, Dr. Rady quickly dismissed the Texas Action in its entirety, just one day before defendants' responses to the complaint and transfer motions were due. Texas Action, D.I. 90.

7. The very same day that he dismissed the Texas Action, and before any defendant could file a declaratory judgment action in New York, Dr. Rady filed ***two new actions*** in ***two different jurisdictions*** asserting in each the ***same two patents asserted in the Texas Action along with two later-issued, related patents***. Dr. Rady filed an action against BCG in the District of Massachusetts: *Rady v. Boston Consulting Group, Inc.*, Case No. 1:26-cv-12979 (WGY) (D. Mass., filed June 29, 2026) ("Massachusetts Action"). Dr. Rady simultaneously filed an action

against De Beers and others in the District of Delaware: *Rady v. Anglo American US Holdings Inc. et al.*, C.A. No. 1:26-cv-00767-CFC (D. Del., filed June 29, 2026) ("Delaware Action"). Dr. Rady filed these actions just hours after dismissing the Texas Action because he knew that BCG was likely to file a declaratory judgment action in New York. But Dr. Rady has not yet served any of the defendants in the Massachusetts Action or the Delaware Action.

8. Dr. Rady asserts the same four patents in both cases: the '261 Patent, the '496 Patent, U.S. Patent No. 12,580,734 ("'734 Patent"), and U.S. Patent No. 12,683,762 ("'762 Patent") (collectively, the "Continuation Patents"). The Continuation Patents are continuations of Dr. Rady's '250 Patent that this Court has already invalidated, share the same specification, and claim substantially the same alleged inventions.

9. In the Massachusetts Action, Dr. Rady alleges that the Continuation Patents are valid and enforceable and that BCG infringes them in connection with its manufacture, use, distribution, and sale of products allegedly embodying the very same technology that BCG and De Beers allegedly took from Dr. Rady and incorporated into the Tracr platform. Massachusetts Action, D.I. 7, ¶¶ 142-203. Those accused products include (1) IoT (Internet of Things) sensor boxes and IoT tool boxes ("IoT Boxes"); (2) custom and/or white-labeled digital twin imaging/scanning systems ("Custom Digital Twin Systems"); and (3) branded product offerings including Bionic Supply Chain, Metachain AI, Value Chain Digital Twin, Industrial Metaverse, and Physical AI (collectively, "Branded Offerings"). Massachusetts Action, D.I. 7, ¶¶ 142-203. Dr. Rady asserts that BCG infringes at least claim 1 of the '261 Patent, at least claim 1 of the '496 Patent, at least claims 1 and 21 of the '734 Patent, and at least claim 7 of the '762 Patent.

10. In the Delaware Action, Dr. Rady alleges that the Continuation Patents are valid and enforceable and that De Beers and others infringe them in connection with the manufacture,

use, distribution, and sale of the Tracr platform developed by De Beers and BCG. Delaware Action, D.I. 5, ¶¶ 113, 119, 125, 132, 159.

11. In sum, Dr. Rady's Massachusetts and Delaware Actions are essentially follow-on actions of his original New York Action in which Dr. Rady is asserting continuations of the now-invalid '250 Patent, adding accused products, and naming as additional alleged infringers BCG's and De Beers' clients and customers.

12. Dr. Rady's allegations in the Massachusetts Action and the Delaware Action are therefore substantially similar to one another and to Dr. Rady's original allegations in the New York Action. For example, the Continuation Patents are all continuations of, and substantially the same as, the '250 Patent held invalid by this Court. The Continuation Patents share the same specification as the '250 Patent. The Continuation Patents and the '250 Patent claim substantially similar alleged inventions. The claims of the Continuation Patents, just like the claims of the invalid '250 Patent, recite the use of spectral data and 3D scan data to create unique digital signatures of gems or other physical objects, or minor variations thereof.

13. Dr. Rady's claims in the Massachusetts Action and Delaware Action also stem from the same alleged conduct that was at the root of Dr. Rady's original New York Action. For example, Dr. Rady alleges in each case (just as he did in the New York Action) that he disclosed his alleged invention to BCG employees in confidence while working from BCG's New York office. *See* Am. Compl. ¶¶ 27-50; Delaware Action, D.I. 5 ¶¶ 43-68; New York Action, D.I. 30 ¶¶ 25-57. Dr. Rady further alleges that BCG misappropriated Dr. Rady's purported invention and used it to develop the De Beers Tracr platform. *See* Am. Compl. ¶¶ 27-50; Delaware Action, D.I. 5 ¶¶ 43-68; New York Action, D.I. 30 ¶¶ 25-57. Dr. Rady further alleges that BCG and De Beers then launched the infringing Tracr platform incorporating his alleged invention in New

York City. *See* Am. Compl. ¶¶ 27-50; Delaware Action, D.I. 5 ¶¶ 43-68; New York Action, D.I. 30 ¶¶ 25-57. Dr. Rady also alleges in each case (just as he did in the New York Action) that many of the same BCG personnel were central actors in the alleged misconduct. *See* Am. Compl. ¶¶ 38-53; Delaware Action, D.I. 5 ¶¶ 54-68; New York Action, D.I. 30 ¶¶ 33-61.

14. Despite the pending Delaware and Massachusetts Actions, Dr. Rady's claims should proceed in this Court. BCG intends to seek transfer of Dr. Rady's claims to this Court pursuant to 28 U.S.C. § 1404(a) and expects defendants in the Delaware Action to do the same. There are numerous advantages to litigating Dr. Rady's claims that BCG, De Beers, and their clients and customers infringe the Continuation Patents in this Court.

15. First, this Court is the true first-filed forum. Dr. Rady himself filed the original New York Action against BCG and De Beers for infringement of the parent '250 Patent in the Southern District of New York. The Continuation Patents claim priority to that same '250 Patent, share the same specification as the '250 Patent, and claim substantially the same alleged inventions as the '250 Patent. Moreover, the foundation for Dr. Rady's claims in the Massachusetts and Delaware Actions is substantially the same as his original claims in the New York Action, *i.e.*, that BCG allegedly stole his purported invention to work with De Beers to develop the Tracr platform.

16. Second, Dr. Rady's anticipatory filing of the Massachusetts and Delaware Actions was pure gamesmanship designed to avoid litigating the Continuation Patents in the Southern District of New York. Dr. Rady dismissed the Texas Action without any advance notice, broke his claims into two actions, and then filed the Massachusetts and Delaware Actions just hours later because he knew that the court in Texas was likely to transfer the claims to the Southern District of New York and that if he did not immediately refile, BCG and De Beers would first

file a declaratory judgment action in New York. Accordingly, Dr. Rady, a resident of France, did not choose Massachusetts and Delaware for convenience; he chose them solely because this Court invalidated his parent ’250 Patent and he wants to try his luck with a different forum for his substantially similar Continuation Patents.

17. Third, judicial economy strongly favors litigation in the Southern District of New York. This Court is already familiar with the alleged invention, the accused technology, and the threshold patentability issues that BCG expects to be dispositive in this case. This Court has already considered the issues relevant to patentability of the parent ’250 Patent and ruled that the claims are invalid under 35 U.S.C. § 101. New York Action, D.I. 37, 38. Here, BCG is seeking a judgment that the Continuation Patents and their substantially similar claims are invalid on the very same ground. BCG anticipates that defendants in the Delaware Action will also challenge the very same claims on that ground. The interests of judicial efficiency are best served by having a single judge resolve that issue, particularly a judge who is already familiar with the issue by virtue of having addressed patentability of the parent ’250 Patent.

18. Fourth, litigating Dr. Rady’s claims in this Court avoids Dr. Rady’s vexatious multiplication of proceedings across two courts in two different states, and furthers judicial economy, because it would allow for a single, coordinated claim construction process. That will ensure that the same claim terms in the same claims of the same patents are interpreted, and then applied, the same way for all parties to the pending Delaware and Massachusetts Actions. Litigation in a single court familiar with the issues will also allow a single judge to rule on invalidity issues in a consistent manner and ensure that the parties are not practically held to different standards in connection with arguments under 35 U.S.C. §§ 102, 103, and 112. Litigation in a single court also would allow the Court to streamline discovery.

19. Fifth, the locus of operative facts is in New York, where Dr. Rady was allegedly working when he disclosed his alleged invention to BCG and where the alleged infringing Tracr platform was announced. Nothing in Dr. Rady's complaints filed in the Massachusetts Action or the Delaware Action changes that fact.

## THE PARTIES

20. BCG is incorporated under the laws of Massachusetts and is headquartered in Massachusetts at 200 Pier 4 Boulevard, Boston, Massachusetts 02210, and has an office at 10 Hudson Yards, New York, New York.

21. Dr. Rady, on information and belief, is a dual U.K.-U.S. citizen who resides and works in France.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over BCG's claims pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and/or 2202.

23. This Court can exercise personal jurisdiction over Dr. Rady as to the claims asserted by BCG in this action pursuant to New York C.P.L.R. § 302(a) and the Due Process Clause of the United States Constitution.

24. BCG's claims arise from Dr. Rady's transacting business within New York State, including Dr. Rady's purported disclosure of his alleged invention to BCG in New York City while he was working in BCG's New York City office.

25. Dr. Rady himself has emphasized that his claims are grounded in business transactions and events that occurred in New York City, including the following:

- On "October 20, 2017, following a presentation by Mr. Rady at the BCG Gamma worldwide event in ***New York City***," a BCG partner "made a proposal to Mr. Rady that he join her team in a senior role to assist with" a BCG project. New York Action, D.I. 30 ¶ 27 (emphasis added).



MF-374150264

- On "January 18, 2018, [Arun] Ravindran contacted Mr. Rady by email, requesting a call to discuss Project Midnight stating: 'this is about De Beers and if/how we can use your provisional patent for it....'" while Dr. Rady "***was working at BCG's office in New York City***. . ." New York Action, D.I. 30 ¶ 37 (emphasis added).

- Following Mr. Ravindran's "assurance that Mr. Rady's unpublished patent application and details regarding his PhD research would be maintained in confidence by BCG, Mr. Rady sent Mr. Ravindran a copy of his unpublished patent application following their discussion" while Dr. Rady was still working from BCG's ***New York City*** office. New York Action, D.I. 30 ¶ 38.

- On "January 22, 2018, Mr. Ravindran organized a Webex meeting with Mr. Rady, ***who was still working from BCG's offices in New York City***, to further discuss Mr. Rady's patent application and research and their potential application to Project Midnight." During this meeting, "Mr. Rady provided significant details regarding an end-to-end solution to create a digital fingerprint and confirm the provenance of physical items such as diamonds, without reliance on a central authority." New York Action, D.I. 30 ¶ 39 (emphasis added).

- "[O]n January 23, 2018, at Mr. Ravindran's request, Mr. Rady, who was still working from ***BCG's offices in New York City***, provided Mr. Ravindran additional confidential details regarding his PhD research and pending patent application and their potential application to Project Midnight." New York Action, D.I. 30 ¶ 40 (emphasis added).

- "[A]t the Jewelers of America National Convention ***in New York City*** on July 28, 2019, Oli Cooper, TRACR's Chief Operating Officer, participated in a panel discussion including executives from Signet Jewelers, Richline Group, and IBM about the use of blockchain technology in the jewelry industry. Upon information and belief, Mr. Cooper promoted the release of TRACR at this event." New York Action, D.I. 30 ¶ 67 (emphasis added).

- "De Beers and BCG promoted TRACR at Consensus 2019 held in ***New York City*** from May 12 - 15, 2019. Consensus is an annual trade show for the cryptocurrency and blockchain industries." New York Action, D.I. 30 ¶ 68.

26. Dr. Rady concedes that many of these interactions and business transactions, including his January 18, 2018, correspondence with Mr. Ravindran, do not concern internal BCG business and instead concern Dr. Rady's "ownership, licensing, and enforcement" of his

alleged patent rights (as explained in Dr. Rady's counsel's recent letter to BCG's New York City-based counsel).

27. Dr. Rady, in fact, first filed a patent infringement action against BCG and De Beers in the Southern District of New York alleging that they infringed the parent '250 Patent. In that New York Action, Dr. Rady emphasized each of the above transactions in connection with alleging that jurisdiction and venue were proper in the Southern District of New York. *See, e.g.*, New York Action, D.I. 30, ¶¶ 27, 37-40, 67, 68. As explained above, the New York Court subsequently invalidated Dr. Rady's '250 Patent under 35 U.S.C. § 101. By filing the first suit in the Southern District of New York, Dr. Rady has consented to personal jurisdiction in this Court for related disputes between the parties, including BCG's claims here.

28. Dr. Rady has since filed several lawsuits asserting claims for infringement of the Continuation Patents that claim priority to the same application that led to the '250 Patent, share the same specification as the '250 Patent, and claim substantially the same alleged inventions as the '250 Patent. In each of those cases, Dr. Rady reiterated that his claims for infringement of the Continuation Patents were grounded in the very same New York business transactions that he pleaded in his original New York Action.

29. For example, and without limitation, Dr. Rady alleged as follows in the Texas Action, Delaware Action, and Massachusetts Action in which he alleged infringement of the Continuation Patents:

- "On October 20, 2017, following a presentation by Dr. Rady about his work on Cyclope at the BCG Gamma worldwide event in ***New York City***, Andrea Gallego ('Ms. Gallego'), a Partner and Chief Technology Officer with BCG's Gamma business unit, asked Dr. Rady to join her as a co-founder for a new project known as 'Source.'" Texas Action, D.I. 44 ¶¶ 40-41; Delaware Action, D.I. 5 ¶ 50; Massachusetts Action, D.I. 7 ¶ 33 (emphasis added).

- "Between January 18, 2018, and February 6, 2018, Dr. Rady had numerous meetings, email exchanges, and phone calls with Mr. Ravindran in which: Mr. Ravindran contacted Dr. Rady to discuss how BCG could use his invention for the De Beers project" and "Mr. Ravindran asked Dr. Rady to send him a copy of his patent application by email (which, at the time, had yet to be published), reiterating the earlier promises made by Mr. Duranton that his invention would be kept confidential and not used without Dr. Rady's permission." Texas Action, D.I. 44 ¶¶ 50-51; Delaware Action, D.I. 5 ¶¶ 60-61; Massachusetts Action, D.I. 7 ¶¶ 43-44.

- "On January 18, 2018, in reliance on Mr. Ravindran's assurances that BCG would maintain the confidentiality of Dr. Rady's patent application and not use any aspect of it without his permission, Dr. Rady provided a copy of his patent application to Mr. Ravindran." Texas Action, D.I. 44 ¶ 52; Delaware Action, D.I. 5 ¶ 61; Massachusetts Action, D.I. 7 ¶ 44.

Although Dr. Rady deleted several of the references to New York from these allegations to try to avoid transfer back to New York, these transactions and events all took place in New York as Dr. Rady's allegations in the original New York Action make clear.

30. In addition, Dr. Rady's counsel has directed substantial correspondence to BCG's New York counsel in connection with his (later abandoned) effort to enforce two of the Continuation Patents in the Texas Action. Dr. Rady's counsel, for example, directed numerous emails to BCG's New York counsel over the past year relating to Dr. Rady's effort to enforce the '261 Patent and '496 Patent against BCG.

31. In addition, since filing the Massachusetts and Delaware Actions, Dr. Rady's counsel has continued to direct correspondence into New York State by writing to BCG's New York counsel based in New York City contending that (1) the Continuation Patents are allegedly not invalid under 35 U.S.C. § 101 and Dr. Rady is not collaterally estopped from litigating that issue; (2) BCG allegedly infringes each of the Continuation Patents; and (3) Dr. Rady will not drop his lawsuit and, instead, will continue to seek to enforce the Continuation Patents against BCG.

32. Accordingly, this Court can exercise specific jurisdiction over Dr. Rady pursuant to New York C.P.L.R. § 302(a) because BCG's claims, by Dr. Rady's own admissions, arise from and relate to Dr. Rady's transaction of business in New York, including Dr. Rady's admitted efforts to enforce his alleged patent rights while working out of BCG's New York City offices, communicating and negotiating about his alleged invention with other BCG employees from BCG's New York City office, disclosing his alleged invention to other BCG employees from BCG's New York City office, and then first filing the New York Action in the Southern District of New York after the launch of Tracr in New York City. New York Action, D.I. 1, 30. Dr. Rady has consented to personal jurisdiction in this Court regarding the subject matter of BCG's claims.

33. The exercise of specific personal jurisdiction over Dr. Rady is also consistent with the Due Process Clause of the United States Constitution. Dr. Rady purposefully engaged in conduct within and directed conduct toward New York, BCG's claims arise out of that conduct, and the exercise of jurisdiction is reasonable and fair—and required to end Dr. Rady's serial filing of related patent infringement actions all over the country to try to avoid this Court after it invalidated his parent '250 Patent.

34. Dr. Rady purposefully engaged in conduct in and directed conduct to New York. For example, Dr. Rady engaged in business relating to his alleged invention while working out of BCG's New York City office, communicated and negotiated about his alleged invention with other BCG employees from BCG's New York City office, and disclosed his alleged invention to other BCG employees from BCG's New York City office. Dr. Rady, following the New York City launch of Tracr, filed and prosecuted the New York Action in the United States District Court for the Southern District of New York.

35. BCG's claims seeking a declaratory judgment of non-infringement and invalidity of the Continuation Patents arise out of and relate to Dr. Rady's conduct within, and directed to, New York. For example, as explained above, Dr. Rady himself alleges that BCG's and others' alleged infringement of the Continuation Patents is grounded in the same New York City events that underpinned his original New York Action. BCG's claims also arise from and relate to the original New York Action that Dr. Rady filed in the Southern District of New York. For example, the Continuation Patents claim priority to the '250 Patent that Dr. Rady asserted in that action, share the same specification, and claim substantially similar alleged inventions. Indeed, BCG seeks to invalidate the Continuation Patents on, *inter alia*, the very same grounds on which the New York Court held them invalid in the New York Action, *i.e.*, that the claims of the Continuation Patents are invalid under 35 U.S.C. § 101 because they are directed to an unpatentable abstract idea.

36. Moreover, it would be reasonable and fair for the Court to exercise personal jurisdiction over Dr. Rady. In addition to the reasons set forth above, it would be reasonable and fair to exercise jurisdiction over Dr. Rady to bring an end to Dr. Rady's brazen forum shopping and vexatious multiplication of proceedings. After this Court invalidated Dr. Rady's '250 Patent, Dr. Rady has sought to avoid this Court by asserting actions for infringement of the Continuation Patents all over the country, including the Texas Action, Massachusetts Action, and Delaware Action. It would be eminently reasonable and fair for the alleged validity and infringement of the Continuation Patents to be resolved in the District in which the relevant events underlying those claims occurred and in the Court in which Dr. Rady himself opted to file the original New York Action—the United States District Court for the Southern District of New York.

37. In fact, it would be unreasonable and unfair to allow Dr. Rady to run from his first forum after an adverse result and to file suits all over the country to try his luck with other courts in other districts in other states. Indeed, Dr. Rady's gamesmanship is epitomized by his filing the Texas Action and then swiftly dismissing it and filing new actions in Massachusetts and Delaware the moment it became clear that the Texas court might send his case back to New York where it belongs.

38. Venue is proper in this Court under 28 U.S.C. §§ 1391(c)(3), 1391(b)(2), and/or 1391(b)(3). Venue is proper under § 1391(c)(3) because Dr. Rady is a non-resident of the United States who is resident and domiciled in France and may therefore be sued in any judicial district. In the alternative, venue is proper under § 1391(b)(2) because, as explained above, a substantial part of the events giving rise to this action occurred in this District.

**COUNT I**
**(Declaration of Invalidity of the '261 Patent)**

39. BCG reasserts and re-alleges the allegations in Paragraphs 1–38 of this Complaint as if fully set forth herein.

40. An actual and justiciable controversy exists between BCG and Dr. Rady regarding the alleged validity of the claims of the '261 Patent, including at least claim 1.

41. Dr. Rady contends that he is the assignee and sole owner of all right, title, and interest in and to the '261 Patent and that the '261 Patent was validly and legally issued by the United States Patent and Trademark Office ("PTO").

42. BCG disputes that the '261 Patent was validly and legally issued by the PTO.

43. The claims of the '261 Patent, including at least claim 1, are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112.

44. For example, and without limitation, the claims of the ’261 Patent, including at least claim 1, are invalid under 35 U.S.C. § 101 because they are directed to a patent-ineligible abstract idea and do not include any inventive concept that transforms them into a patent-eligible application of this abstract idea. Claim 1 and the other claims of the ’261 Patent are directed to the abstract idea of collecting, analyzing, and storing data and fail to recite any inventive concept. Accordingly, the claims of the ’261 Patent are unpatentable and invalid for the same reasons as the claims of the ’250 Patent were held unpatentable and invalid by this Court, a decision upheld by the Federal Circuit. *See* New York Action, D.I. 58; *Rady*, No. 2022-2218, 2024 WL 1298742 (Fed. Cir. Mar. 27, 2024).

45. Dr. Rady is, in fact, collaterally estopped from re-litigating that issue. *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1341-42 (Fed. Cir. 2013). The Federal Circuit has emphasized that collateral estoppel is not “limit[ed] to patent claims that are identical.” *Id.* at 1342. Rather, it applies whenever the claims are substantially similar and “the differences between the unadjudicated patent claims and the adjudicated patent claims do not materially alter the question of invalidity.” *Id.* Here, claim 1 and the other asserted claims of the ’261 Patent are substantially similar to the claims that this Court invalidated in the parent ’250 Patent and any differences between the claims do not materially alter the question of patentability. For example, and without limitation, claim 1 of the ’261 Patent, like claim 1 of the ’250 Patent, recites creating and/or saving a unique signature for a physical item created using both spectral data and three-dimensional data of a physical item, obtained through a spectral imaging component and a three-dimensional imaging or scanning component.

46. The claims of the ’261 Patent, including at least claim 1, are also invalid under 35 U.S.C. § 102 and/or 103. For example, claim 1 and the other claims of the ’261 Patent are

anticipated and/or rendered obvious by Kim, Min H., *et al.*, *3D Imaging Spectroscopy for Measuring Hyperspectral Patterns on Solid Objects*, ACM Transactions on Graphics, Vol. 31, No. 4, Article 38, Publication Date July 2012 ("Kim *et al.*"), alone or in combination with other references. Kim *et al.* is a printed publication that was published July 2012 and is therefore prior art to the '261 Patent pursuant to at least 35 U.S.C. § 102(a)(1). Kim *et al.* discloses the use of spectral imaging and scanning to create digital signatures for physical objects that can be used to identify and track 3D physical objects as shown, for example, in Figure 1:




**Figure 1:** *An overview of our system for measuring a three-dimensional (3D) hyperspectral pattern on a solid object. Our 3D imaging spectroscopy (3DIS) system measures 3D geometry and hyperspectral radiance simultaneously. Piecewise geometries and radiances are reconstructed into a 3D hyperspectral pattern by our reconstruction pipeline. Our system is used to measure physically-meaningful 3D hyperspectral patterns of various wavelengths for scientific research.*

Kim *et al.*, Fig. 1

47. Kim *et al.* discloses or renders obvious, alone or in combination with other prior art, each of the limitations of claim 1 of the '261 Patent. *See, e.g.*, Kim *et al.* at 38:1, 38:4, 38:6, 38:7, 38:10. Exemplary disclosures from Kim *et al.* disclosing various aspects of the alleged invention claimed in claim 1 of the '261 Patent include the following:

- "[A]ccurate spectral ***signatures*** are valuable in the ***analysis and identification of materials***" p. 38:1 (§ 1 (emphasis added))
- "We introduce an end-to-end measurement system for ***capturing spectral data on 3D objects***." (p. 38:1 (Abstract) (emphasis added))
- "We mount the imager, a ***laser scanning system*** and Xenon light source on a standard optical table, located in a black walled room." (p. 38:6 (§ 4))
- "***Our 3D imaging spectroscopy (3DIS) system measures 3D geometry and hyperspectral radiance simultaneously***. Piecewise geometries and radiances are reconstructed into a 3D hyperspectral pattern by our reconstruction pipeline." p.



MF-374150264

38:1 (Fig. 1 caption (emphasis added))

48. The claims of the ’261 Patent, including at least claim 1, are also invalid under 35 U.S.C. § 112. For example, and without limitation, claim 1 and the other claims of the ’261 Patent are invalid because “unique digital signature” is indefinite, *i.e.*, this limitation read in light of the specification and the prosecution history fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

49. BCG seeks judgment from the Court that claim 1 and the other claims of the ’261 Patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112.

**COUNT II**
**(Declaration of Non-Infringement of the ’261 Patent)**

50. BCG reasserts and re-alleges the allegations in Paragraphs 1–38 of this Complaint as if fully set forth herein.

51. An actual and justiciable controversy exists between BCG and Dr. Rady regarding BCG’s alleged infringement of the ’261 Patent.

52. Dr. Rady contends that BCG infringes one or more claims of the ’261 Patent, including at least claim 1. More specifically, Dr. Rady contends that BCG infringes at least claim 1 of the ’261 Patent in connection with its alleged manufacture, use, offer for sale, and sale of (i) IoT Sensor Boxes, (ii) Bionic Supply Chain, Metachain AI, Value Chain Digital Twin, Industrial Metaverse, and Physical AI, and (iii) Custom and/or White Labeled Digital Twin Imaging/Scanning Systems.

53. BCG does not infringe, and has not infringed, claim 1 or any other claims of the ’261 Patent directly or indirectly, whether literally or under the doctrine of equivalents. For example, and without limitation, BCG does not directly infringe claim 1 of the ’261 Patent because, without limitation, the above-identified BCG accused products do not use 3D scan data

and spectral imaging data to create unique digital signatures for physical objects and do not meet at least the following limitations:

- a spectral imaging camera mounted in or on said housing;
- a laser range scanner mounted in or on said housing;
- a processor in electronic communication with said spectral imaging camera, and said laser range scanner;
- said non-transient computer-readable memory containing a plurality of unique digital signatures for a plurality of pre-recorded specific physical items, each of said unique digital signatures comprising a digital combination of spectral data and 3D scan data of one of said pre-recorded specific physical items identifying and mapping in 3D coordinate space physical features of said one of said pre-recorded specific physical items;
- wherein said physical features comprise one or more of anomalies, defects, imperfections, flaws, geometric irregularities, inclusions, occlusions, scratches, tears, and warps.

54. BCG also has not induced or contributed to the alleged infringement of the ’261 Patent by any third party in connection with (i) IoT Sensor Boxes, (ii) Bionic Supply Chain, Metachain AI, Value Chain Digital Twin, Industrial Metaverse, and Physical AI, or (iii) Custom and/or White Labeled Digital Twin Imaging/Scanning Systems. BCG has not induced infringement under 35 U.S.C. § 271(b) because BCG has not encouraged acts that constitute infringement by any third party, let alone with knowledge of the patent and the specific intent to induce infringement. BCG has not contributed to infringement under 35 U.S.C. § 271(c) because BCG has not sold, offered, or imported any component that is a material part of the alleged invention and that has no substantial non-infringing uses with knowledge of the patents and that the component is made or adapted for an infringing use.

55. BCG seeks judgment from the Court that it does not infringe, and has not infringed, claim 1 or any other claims of the ’261 Patent, directly or indirectly, whether literally or under the doctrine of equivalents.

**COUNT III**
**(Declaration of Invalidity of the ’496 Patent)**

56. BCG reasserts and re-alleges the allegations in Paragraphs 1–38 of this Complaint as if fully set forth herein.

57. An actual and justiciable controversy exists between BCG and Dr. Rady regarding the alleged validity of the ’496 Patent, including at least claim 1.

58. Dr. Rady contends that he is the assignee and sole owner of all right, title, and interest in and to the ’496 Patent and that the ’496 Patent was validly and legally issued by the PTO.

59. BCG disputes that the ’496 Patent was validly and legally issued by the PTO.

60. The claims of the ’496 Patent, including at least claim 1, are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112.

61. For example, and without limitation, the claims of the ’496 Patent, including at least claim 1, are invalid under 35 U.S.C. § 101 because they are directed to a patent-ineligible abstract idea and do not include any inventive concept that transforms them into a patent-eligible application of this abstract idea. Claim 1 and the other claims of the ’496 Patent are directed to the abstract idea of collecting, analyzing, and storing data and fail to recite any inventive concept. Accordingly, the claims of the ’496 Patent are unpatentable and invalid for the same reasons as the claims of the ’250 Patent were held unpatentable and invalid by this Court, a decision upheld by the Federal Circuit. *See* New York Action, D.I. 58; *Rady*, No. 2022-2218, 2024 WL 1298742 (Fed. Cir. Mar. 27, 2024).

62. Dr. Rady is, in fact, collaterally estopped from re-litigating that issue. *Ohio Willow Wood*, 735 F.3d at 1341-42. The Federal Circuit has emphasized that collateral estoppel is not "limit[ed] to patent claims that are identical." *Id.* at 1342. Rather, it applies whenever the claims are substantially similar and "the differences between the unadjudicated patent claims and the adjudicated patent claims do not materially alter the question of invalidity." *Id.* Here, claim 1 and the other asserted claims of the '496 Patent are substantially similar to the claims that this Court invalidated in the parent '250 Patent and any differences between the claims do not materially alter the question of patentability. For example, and without limitation, claim 1 of the '496 Patent, like claim 1 of the '250 Patent, recites creating and/or saving a unique signature for a physical item created using both spectral data and three-dimensional data of a physical item, obtained through a spectral imaging component and a three-dimensional imaging or scanning component.

63. The claims of the '496 Patent, including at least claim 1, are also invalid under 35 U.S.C. § 102 and/or 103. For example, claim 1 and the other claims of the '496 Patent are anticipated and/or rendered obvious by Kim, Min H., *et al.* Kim *et al.* is a printed publication that was published July 2012 and is therefore prior art to the '496 Patent pursuant to at least 35 U.S.C. § 102(a)(1). Kim *et al.* discloses the use of spectral imaging and scanning to create signatures for physical objects that can be used to identify and track 3D physical objects as shown, for example, in Figure 1:




**Figure 1:** *An overview of our system for measuring a three-dimensional (3D) hyperspectral pattern on a solid object. Our 3D imaging spectroscopy (3DIS) system measures 3D geometry and hyperspectral radiance simultaneously. Piecewise geometries and radiances are reconstructed into a 3D hyperspectral pattern by our reconstruction pipeline. Our system is used to measure physically-meaningful 3D hyperspectral patterns of various wavelengths for scientific research.*

Kim *et al.*, Fig. 1

64. Kim *et al.* discloses or renders obvious, alone or in combination with other prior art, each of the limitations of claim 1 of the '496 Patent. *See, e.g.*, Kim *et al.* at 38:1, 38:4, 38:6, 38:7, 38:10. Exemplary disclosures from Kim *et al.* disclosing various aspects of the alleged invention claimed in claim 1 of the '496 Patent include the following:

- "[A]ccurate spectral ***signatures*** are valuable in the ***analysis and identification of materials***" p. 38:1 (§ 1 (emphasis added))

- "We introduce an end-to-end measurement system for ***capturing spectral data on 3D objects***." (p. 38:1 (Abstract) (emphasis added))

- "We mount the imager, a ***laser scanning system*** and Xenon light source on a standard optical table, located in a black walled room." (p. 38:6 (§ 4))

- "***Our 3D imaging spectroscopy (3DIS) system measures 3D geometry and hyperspectral radiance simultaneously***. Piecewise geometries and radiances are reconstructed into a 3D hyperspectral pattern by our reconstruction pipeline." p. 38:1 (Fig. 1 caption (emphasis added))

65. The claims of the '496 Patent, including at least claim 1, are also invalid under 35 U.S.C. § 112. For example, and without limitation, claim 1 and the other claims of the '496 Patent are invalid because "unique signature" is indefinite, *i.e.*, this limitation read in light of the specification and the prosecution history fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

66. BCG seeks judgment from the Court that claim 1 and the other claims of the ’496 Patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112.

**COUNT IV**
**(Declaration of Non-Infringement of the ’496 Patent)**

67. BCG reasserts and re-alleges the allegations in Paragraphs 1–38 of this Complaint as if fully set forth herein.

68. An actual and justiciable controversy exists between BCG and Dr. Rady regarding BCG’s alleged infringement of the ’496 Patent.

69. Dr. Rady contends that BCG infringes one or more claims of the ’496 Patent, including at least claim 1. More specifically, Dr. Rady contends that BCG infringes at least claim 1 of the ’496 Patent in connection with its alleged manufacture, use, offer for sale, and sale of (i) IoT Sensor Boxes, (ii) Bionic Supply Chain, Metachain AI, Value Chain Digital Twin, Industrial Metaverse, and Physical AI, and (iii) Custom and/or White Labeled Digital Twin Imaging/Scanning Systems.

70. BCG does not infringe, and has not infringed, claim 1 or any other claims of the ’496 Patent directly or indirectly, whether literally or under the doctrine of equivalents. For example, and without limitation, BCG does not directly infringe claim 1 of the ’496 Patent because, without limitation, the above-identified BCG accused products do not use 3D scan data and spectral imaging data to create unique digital signatures for physical objects and do not meet at least the following limitations:

- system comprising one or more processors, a spectral imaging camera, a laser range scanner, a light source . . .
- said non-transient computer-readable memory containing computer-readable instructions which when executed by said one or more processors cause said one or more processors to:

- use spectral data for a physical item received from said spectral imaging camera and 3D scan data for said physical item received from said laser range scanner to identify and map in 3D coordinate space physical features of said physical item,
- reflecting relative distances between said physical features of said physical item to generate a unique signature for said physical item, and
- record said unique signature for said physical item.

71. BCG also has not induced or contributed to the alleged infringement of the ’496 Patent by any third party in connection with (i) IoT Sensor Boxes, (ii) Bionic Supply Chain, Metachain AI, Value Chain Digital Twin, Industrial Metaverse, and Physical AI, and (iii) Custom and/or White Labeled Digital Twin Imaging/Scanning Systems. BCG has not induced infringement under 35 U.S.C. § 271(b) because BCG has not encouraged acts that constitute infringement by any third party, let alone with knowledge of the patent and the specific intent to induce infringement. BCG has not contributed to infringement under 35 U.S.C. § 271(c) because BCG has not sold, offered, or imported any component that is a material part of the alleged invention and that has no substantial non-infringing uses with knowledge of the patents and that the component is made or adapted for an infringing use.

72. BCG seeks judgment from the Court that it does not infringe, and has not infringed, claim 1 or any other claims of the ’496 Patent, directly or indirectly, whether literally or under the doctrine of equivalents.

## **COUNT V**
## **(Declaration of Invalidity of the ’734 Patent)**

73. BCG reasserts and re-alleges the allegations in Paragraphs 1–38 of this Complaint as if fully set forth herein.

74. An actual and justiciable controversy exists between BCG and Dr. Rady regarding the alleged validity of the ’734 Patent, including at least claims 1 and 21.

75. Dr. Rady contends that he is the assignee and sole owner of all right, title, and interest in and to the ’734 Patent and that the ’734 Patent was validly and legally issued by the PTO.

76. BCG disputes that the ’734 Patent was validly and legally issued by the PTO.

77. The claims of the ’734 Patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112.

78. For example, and without limitation, the claims of the ’734 Patent, including at least claims 1 and 21, are invalid under 35 U.S.C. § 101 because they are directed to a patent-ineligible abstract idea and do not include any inventive concept that transforms them into a patent-eligible application of this abstract idea. Claims 1 and 21 and the other claims of the ’734 Patent are directed to the abstract idea of collecting, analyzing, and storing data and fail to recite any inventive concept. Accordingly, the claims of the ’734 Patent are unpatentable and invalid for the same reasons as the claims of the ’250 Patent were held unpatentable and invalid by this Court, a decision upheld by the Federal Circuit. *See* New York Action, D.I. 58; *Rady*, No. 2022-2218, 2024 WL 1298742 (Fed. Cir. Mar. 27, 2024).

79. Dr. Rady is, in fact, collaterally estopped from re-litigating that issue. *Ohio Willow Wood*, 735 F.3d at 1341-42. The Federal Circuit has emphasized that collateral estoppel is not “limit[ed] to patent claims that are identical.” *Id.* at 1342. Rather, it applies whenever the claims are substantially similar and “the differences between the unadjudicated patent claims and the adjudicated patent claims do not materially alter the question of invalidity.” *Id.* Here, claims 1 and 21 of the ’734 Patent and the other asserted claims of the ’734 Patent are substantially

similar to the claims that this Court invalidated in the parent ’250 Patent and any differences between the claims do not materially alter the question of patentability. For example, and without limitation, claims 1 and 21 of the ’734 Patent, like claim 1 of the ’250 Patent, recite creating and/or saving a unique signature for a physical item created using both spectral data and three-dimensional data of a physical item, obtained through a spectral imaging component and a three-dimensional imaging or scanning component.

80. The claims of the ’734 Patent, including at least claims 1 and 21, are also invalid under 35 U.S.C. § 102 and/or 103. For example, claims 1 and 21 and the other claims of the ’734 Patent are anticipated and/or rendered obvious by Kim, Min H., *et al.* Kim *et al.* is a printed publication that was published July 2012 and is therefore prior art to the ’734 Patent pursuant to at least 35 U.S.C. § 102(a)(1). Kim *et al.* discloses the use of spectral imaging and scanning to create signatures for physical objects that can be used to identify and track 3D physical objects as shown, for example, in Figure 1:




**Figure 1:** *An overview of our system for measuring a three-dimensional (3D) hyperspectral pattern on a solid object. Our 3D imaging spectroscopy (3DIS) system measures 3D geometry and hyperspectral radiance simultaneously. Piecewise geometries and radiances are reconstructed into a 3D hyperspectral pattern by our reconstruction pipeline. Our system is used to measure physically-meaningful 3D hyperspectral patterns of various wavelengths for scientific research.*

Kim *et al.*, Fig. 1

81. Kim *et al.* discloses or renders obvious, alone or in combination with other prior art, each of the limitations of claims 1 and 21 of the ’734 Patent. *See, e.g.*, Kim *et al.* at 38:1, 38:4, 38:6, 38:7, 38:10. Exemplary disclosures from Kim *et al.* disclosing various aspects of the alleged invention claimed in claims 1 and 21 of the ’734 Patent include the following:

- "[A]ccurate spectral ***signatures*** are valuable in the ***analysis and identification of materials***" p. 38:1 (§ 1 (emphasis added))

- "We introduce an end-to-end measurement system for ***capturing spectral data on 3D objects***." (p. 38:1 (Abstract) (emphasis added))

- "We mount the imager, a ***laser scanning system*** and Xenon light source on a standard optical table, located in a black walled room." (p. 38:6 (§ 4))

- "***Our 3D imaging spectroscopy (3DIS) system measures 3D geometry and hyperspectral radiance simultaneously***. Piecewise geometries and radiances are reconstructed into a 3D hyperspectral pattern by our reconstruction pipeline." p. 38:1 (Fig. 1 caption (emphasis added))

82. The claims of the '734 Patent, including at least claims 1 and 21, are also invalid under 35 U.S.C. § 112. For example, and without limitation, claims 1 and 21 and the other claims of the '734 Patent are invalid because "unique digital signature" is indefinite, *i.e.*, this limitation read in light of the specification and the prosecution history fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

83. BCG seeks judgment from the Court that claims 1 and 21 and the other claims of the '734 Patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112.

**COUNT VI**
**(Declaration of Non-Infringement of the '734 Patent)**

84. BCG reasserts and re-alleges the allegations in Paragraphs 1–38 of this Complaint as if fully set forth herein.

85. An actual and justiciable controversy exists between BCG and Dr. Rady regarding BCG's alleged infringement of the '734 Patent.

86. Dr. Rady contends that BCG infringes one or more claims of the '734 Patent, including at least claims 1 and 21. More specifically, Dr. Rady contends that BCG infringes at least claims 1 and 21 of the '734 Patent in connection with its alleged manufacture, use, offer for sale, and sale of (i) IoT Sensor Boxes, (ii) Bionic Supply Chain, Metachain AI, Value Chain

Digital Twin, Industrial Metaverse, and Physical AI, and (iii) Custom and/or White Labeled Digital Twin Imaging/Scanning Systems.

87. BCG does not infringe, and has not infringed, claims 1, 21, or any other claims of the ’734 Patent directly or indirectly, whether literally or under the doctrine of equivalents. For example, and without limitation, BCG does not directly infringe claim 1 of the ’734 Patent because, without limitation, the above-identified BCG accused products do not use 3D scan data and spectral imaging data to create unique digital signatures for physical objects and do not meet at least the following limitations:

- imaging said physical item to produce 3D spatial information and spectral data;
- using said 3D spatial information and said spectral data to generate a digital 3D spatial map of said physical item, mapping in 3D coordinate space physical features of said physical item;
- using said digital 3D spatial map to generate a unique digital signature for said physical item;
- comparing said unique digital signature to a plurality of previously recorded unique digital signatures corresponding to a plurality of previously imaged physical items to determine whether said physical item is identical to, part of, or completely different from any of said previously imaged physical items;
- wherein said comparing step includes rotating in virtual space said physical features of said physical item defined by said unique digital signature to identify a match with physical features defined by one of said plurality of previously recorded digital signatures, and
- recording said unique digital signature on a non-transient computer readable memory.

88. BCG does not infringe claim 21 of the ’734 Patent because, without limitation, the above-identified BCG accused products do not use 3D scan data and spectral imaging data to create unique digital signatures for physical objects and do not meet at least the following limitations:

- a spectral imaging camera mounted in or on said housing;
- a processor in electronic communication with said spectral imaging camera;
- said non-transient computer-readable memory comprises computer readable instructions which when executed by said processor cause said processor to:
    - use spectral data of a first specimen and 3D spatial information of said first specimen to generate
    - a first specimen plurality of points (x, y, z) mapping in 3D coordinate space physical features of said first specimen, and b) a plurality of triplets [(x, y, z), (x′, y′, z′), (x″, y″ z″)] of said first specimen plurality of points in said 3D coordinate space,
    - assign a unique digital signature to said first specimen, said unique digital signature comprising
    - said first specimen said plurality of points and said plurality of triplets,
    - wherein said physical features comprise one or more of anomalies, defects, imperfections, flaws, geometric irregularities, inclusions, occlusions, scratches, tears, and warps.

89. BCG also has not induced or contributed to the alleged infringement of the ’734 Patent by any third party in connection with (i) IoT Sensor Boxes, (ii) Bionic Supply Chain, Metachain AI, Value Chain Digital Twin, Industrial Metaverse, and Physical AI, and (iii) Custom and/or White Labeled Digital Twin Imaging/Scanning Systems. BCG has not induced infringement under 35 U.S.C. § 271(b) because BCG has not encouraged acts that constitute infringement by any third party, let alone with knowledge of the patent and the specific intent to induce infringement. BCG has not contributed to infringement under 35 U.S.C. § 271(c) because BCG has not sold, offered, or imported any component that is a material part of the alleged invention and that has no substantial non-infringing uses with knowledge of the patents and that the component is made or adapted for an infringing use.

90. BCG seeks judgment from the Court that it does not infringe, and has not infringed, claims 1 or 21 or any other claims of the ’734 Patent, directly or indirectly, whether literally or under the doctrine of equivalents.

**COUNT VII**
**(Declaration of Invalidity of the ’762 Patent)**

91. BCG reasserts and re-alleges the allegations in Paragraphs 1–38 of this Complaint as if fully set forth herein.

92. An actual and justiciable controversy exists between BCG and Dr. Rady regarding the alleged validity of the ’762 Patent, including at least claim 7.

93. Dr. Rady contends that he is the assignee and sole owner of all right, title, and interest in and to the ’762 Patent and that the ’762 Patent was validly and legally issued by the PTO.

94. BCG disputes that the ’762 Patent was validly and legally issued by the PTO.

95. The claims of the ’762 Patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112.

96. For example, and without limitation, the claims of the ’762 Patent are invalid under 35 U.S.C. § 101 because they are directed to a patent-ineligible abstract idea and do not include any inventive concept that transforms them into a patent-eligible application of this abstract idea. Claim 7 and the other claims of the ’762 Patent are directed at the abstract idea of collecting, analyzing, and storing data and fail to recite any inventive concept. Accordingly, the claims of the ’762 Patent are unpatentable and invalid for the same reasons as the claims of the ’250 Patent were held unpatentable and invalid by this Court, a decision upheld by the Federal Circuit. *See* New York Action, D.I. 58; *Rady*, No. 2022-2218, 2024 WL 1298742 (Fed. Cir. Mar. 27, 2024).

97. Dr. Rady is, in fact, collaterally estopped from re-litigating that issue. *Ohio Willow Wood*, 735 F.3d at 1341-42. The Federal Circuit has emphasized that collateral estoppel is not "limit[ed] to patent claims that are identical." *Id.* at 1342. Rather, it applies whenever the claims are substantially similar and "the differences between the unadjudicated patent claims and the adjudicated patent claims do not materially alter the question of invalidity." *Id.* Here, claim 7 and the other asserted claims of the '762 Patent are substantially similar to the claims that this Court invalidated in the parent '250 Patent and any differences between the claims do not materially alter the question of patentability. For example, and without limitation, claim 7 of the '762 Patent, like claim 1 of the '250 Patent, recites creating and/or saving a unique signature for a physical item created using both spectral data and three-dimensional data of a physical item, obtained through a spectral imaging component and a three-dimensional imaging or scanning component.

98. The claims of the '762 Patent are also invalid under 35 U.S.C. § 102 and/or 103. For example, claim 7 and the other claims of the '762 Patent are anticipated and/or rendered obvious by Kim, Min H., *et al.* Kim *et al.* is a printed publication that was published July 2012 and is therefore prior art to the '762 Patent pursuant to at least 35 U.S.C. § 102(a)(1). Kim *et al.* discloses the use of spectral imaging and scanning to create signatures for physical objects that can be used to identify and track 3D physical objects as shown, for example, in Figure 1:




**Figure 1:** *An overview of our system for measuring a three-dimensional (3D) hyperspectral pattern on a solid object. Our 3D imaging spectroscopy (3DIS) system measures 3D geometry and hyperspectral radiance simultaneously. Piecewise geometries and radiances are reconstructed into a 3D hyperspectral pattern by our reconstruction pipeline. Our system is used to measure physically-meaningful 3D hyperspectral patterns of various wavelengths for scientific research.*

| Kim *et al.*, Fig. 1 |
|---|

99. Kim *et al.* discloses or renders obvious, alone or in combination with other prior art, each of the limitations of claim 7 of the ’762 Patent. *See, e.g.*, Kim *et al.* at 38:1, 38:4, 38:6, 38:7, 38:10. Exemplary disclosures from Kim *et al.* disclosing various aspects of the alleged invention claimed in claim 7 of the ’762 Patent include the following:

- “[A]ccurate spectral ***signatures*** are valuable in the ***analysis and identification of materials***” p. 38:1 (§ 1 (emphasis added))
- “We introduce an end-to-end measurement system for ***capturing spectral data on 3D objects***.” (p. 38:1 (Abstract) (emphasis added))
- “We mount the imager, a ***laser scanning system*** and Xenon light source on a standard optical table, located in a black walled room.” (p. 38:6 (§ 4))
- “***Our 3D imaging spectroscopy (3DIS) system measures 3D geometry and hyperspectral radiance simultaneously***. Piecewise geometries and radiances are reconstructed into a 3D hyperspectral pattern by our reconstruction pipeline.” p. 38:1 (Fig. 1 caption (emphasis added))

100. The claims of the ’762 Patent are also invalid under 35 U.S.C. § 112. For example, and without limitation, claim 7 and the other claims of the ’762 Patent are invalid because “unique signature” is indefinite, *i.e.*, this limitation read in light of the specification and the prosecution history fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

101. BCG seeks judgment from the Court that claim 7 and the other claims of the ’762 Patent are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT VIII
## (Declaration of Non-Infringement of the ’762 Patent)

102. BCG reasserts and re-alleges the allegations in Paragraphs 1–38 of this Complaint as if fully set forth herein.

103. An actual and justiciable controversy exists between BCG and Dr. Rady regarding BCG's alleged infringement of the '762 Patent.

104. Dr. Rady contends that BCG infringes one or more claims of the '762 Patent, including at least claim 7. More specifically, Dr. Rady contends that BCG infringes at least claim 7 of the '762 Patent in connection with its alleged manufacture, use, offer for sale, and sale of (i) IoT Sensor Boxes, (ii) Bionic Supply Chain, Metachain AI, Value Chain Digital Twin, Industrial Metaverse, and Physical AI, and (iii) Custom and/or White Labeled Digital Twin Imaging/Scanning Systems.

105. BCG does not infringe, and has not infringed, claim 7 or any other claims of the '762 Patent directly or indirectly, whether literally or under the doctrine of equivalents. For example, and without limitation, BCG does not directly infringe claim 7 of the '762 Patent because, without limitation, the above-identified BCG accused products do not use 3D scan data and spectral imaging data to create unique digital signatures for physical objects and do not meet at least the following limitations:

- a first computer device connected to a peer-to-peer network, said first computer device having a first computer processor and a first computer non-transient computer-readable memory containing a plurality of unique digital signatures for a plurality of pre-recorded specific physical items, each one of said plurality of unique digital signatures comprising a digital 3D spatial map comprising a plurality of points (x, y, z) mapping in 3D coordinate space physical features of a pre-recorded specific physical item,

- a second computer device connected to said peer-to-peer network, said second computer device having a second computer processor and a second computer non-transient computer-readable memory containing a copy of said plurality of unique digital signatures,

- a third computer device having a third computer processor and a third computer non-transient computer-readable memory comprising computer readable instructions which when executed by said processor cause said processor to:

- transmit a user input to at least one of said first computer device and said second computer device, said user input corresponding to a specific physical item,

- receive from one of said first computer device and said second computer device information relating to said specific physical item and displaying said information to a user of said third computer device,

- wherein at least one of said first computer non-transient computer readable memory and said second computer non-transient computer-readable memory contains computer-readable instructions which, when executed by said first computer processor or said second computer processor, uses said user input to identify a specific physical item wherein said specific physical item has a unique digital signature among said plurality of unique digital signatures for said plurality of pre-recorded specific physical items.

106. BCG also has not induced or contributed to the alleged infringement of the ’762 Patent by any third party in connection with (i) IoT Sensor Boxes, (ii) Bionic Supply Chain, Metachain AI, Value Chain Digital Twin, Industrial Metaverse, and Physical AI, and (iii) Custom and/or White Labeled Digital Twin Imaging/Scanning Systems. BCG has not induced infringement under 35 U.S.C. § 271(b) because BCG has not encouraged acts that constitute infringement by any third party, let alone with knowledge of the patent and the specific intent to induce infringement. BCG has not contributed to infringement under 35 U.S.C. § 271(c) because BCG has not sold, offered, or imported any component that is a material part of the alleged invention and that has no substantial non-infringing uses with knowledge of the patents and that the component is made or adapted for an infringing use.

107. BCG seeks judgment from the Court that it does not infringe, and has not infringed, claim 7 or any other claims of the ’762 Patent, directly or indirectly, whether literally or under the doctrine of equivalents.

## PRAYER FOR RELIEF

WHEREFORE, BCG prays for judgment in its favor against Dr. Rady and granting BCG the following relief:

A. That this Court enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the claims of the ’261 Patent are invalid and that BCG does not infringe, and has not infringed, those claims either literally or under the doctrine of equivalents;

B. That this Court enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the claims of the ’496 Patent are invalid and that BCG does not infringe, and has not infringed, those claims either literally or under the doctrine of equivalents;

C. That this Court enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the claims of the ’734 Patent are invalid and that BCG does not infringe, and has not infringed, those claims either literally or under the doctrine of equivalents;

D. That this Court enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the claims of the ’762 Patent are invalid and that BCG does not infringe, and has not infringed, those claims either literally or under the doctrine of equivalents;

E. That BCG be awarded the costs incurred by it in connection with this action;

F. That this Court adjudge and decree that this case is exceptional and award BCG its reasonable attorneys’ fees, expenses, and costs in this action pursuant to 35 U.S.C. § 285; and

G. That this Court grant BCG such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), BCG demands a trial by jury on all claims and issues so triable.

Dated: September 23, 2026

MORRISON & FOERSTER LLP

By: */s/ Kyle Mooney*

Kyle Mooney
250 West 55th Street
New York, NY 10019
212-468-8000
kmooney@mofo.com

Aaron G. Fountain
(*pro hac* forthcoming)
Charles Provine
(*pro hac* forthcoming)
200 Clarendon Street,
Boston, MA 02116
512-617-0650
afountain@mofo.com
cprovine@mofo.com

Audra Sawyer
(*pro hac* forthcoming)
2100 L St NW, Suite 900
Washington, DC 20037
202-887-1500
asawyer@mofo.com

*Attorneys for Plaintiff*
*Boston Consulting Group, Inc.*